**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ELLEN UMANSKY** | : | CIVIL ACTION |
| 119 Danby Court | : | NO.: 2:17-cv-4712 |
| Southampton, PA 18966 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | JURY TRIAL OF TWELVE (12) |
| | : | JURORS DEMANDED |
| **MELTON INTERNATIONAL TACKLE, INC.** | : | |
| 1375 S. State College Blvd. | : | |
| Anaheim, CA 92806 | : | |
| | : | |
| And | : | |
| | : | |
| **DISCOVER BANK** | : | |
| **d/b/a DISCOVER FINANCIAL SERVICES** | : | |
| **d/b/a DISCOVER PRODUCTS** | : | |
| 12 Reads Way | : | |
| New Castle, DE 19720 | : | |
| | : | |
| And | : | |
| | : | |
| **DISCOVER FINANCIAL SERVICES, INC** | : | |
| **d/b/a DISCOVER BANK** | : | |
| **d/b/a DISCOVER FINANCIAL SERVICES** | : | |
| **d/b/a DISCOVER PRODUCTS** | : | |
| 2500 Lake Cook Rd | : | |
| Riverwoods, IL 60015 | : | |
| | : | |
| And | : | |
| | : | |
| **DISCOVER FINANCIAL SERVICES, LLC** | : | |
| **d/b/a DISCOVER BANK** | : | |
| **d/b/a DISCOVER FINANCIAL SERVICES** | : | |
| **d/b/a DISCOVER PRODUCTS** | : | |
| 2500 Lake Cook Rd | : | |
| Riverwoods, IL 60015 | : | |
| | : | |
| Defendants. | : | |

**<u>FIRST AMENDED
CIVIL ACTION COMPLAINT</u>**

### I.    PARTIES

1.    Plaintiff, Ellen Umansky, is an adult individual residing at the above-captioned address.

2.    Defendant, Melton International Tackle, Inc. (hereinafter "Melton") is corporation existing by virtue of and operating under the laws of the State of California, with its principal place of business at the above-captioned address. Melton sells merchandise to residents of the Commonwealth of Pennsylvania through its website, thereby subjecting itself to the jurisdiction of this Honorable Court.

3.    Defendant, Discover Bank, is a federally insured bank existing by virtue of and operating under the laws of the State of Delaware, with a principal place of business at the above captioned address. Discover Bank is a wholly-owned subsidiary of Defendant, Discover Financial Services, Inc.

4.    Defendant, Discover Financial Services, Inc. is a corporation existing by virtue of and operating under the laws of the State of Delaware, with a principal place of business at the above captioned address. Defendant, Discover Financial Services, Inc. is, upon information and belief, the issuer and owner of Discover credit cards which are issued to consumers pursuant to an extension of credit agreement with them.

5.    Defendant, Discover Financial Services, LLC is a limited liability company existing by virtue of and operating under the laws of the State of Delaware, with a principal place of business at the above captioned address. Defendant, Discover Financial Services, LLC is affiliated with Discover Bank and exclusively provides services for Discovery Bank including as marketing, application approval, transaction approval, customer service, security, billing and the collection of delinquent accounts.

6.     Defendants, Discover Bank, Discover Financial Services, Inc., and Discover Financial Services, LLC are referred to jointly herein as "Discover."

## II.     JURISDICTION AND VENUE

7.     Jurisdiction arises under Title 28 of the United States Code, Section 1331, as well as under Title 15 the United States Code, Section 1666. Supplemental jurisdiction over Plaintiffs' state law claims is granted by Title 28 of the United States Code, Section1367(a).

8.     Venue lies in this District as the events which gave rise to this claim occurred within this District.

## III.     OPERATIVE FACTS

9.     At all times relevant, Melton acted by and through its agents and employees.

10.    At all times relevant, Discover acted by and through its agents and employees.

11.    At all times relevant, Umansky acted individually and through her friend and agent, George Barnard ("George").

12.    In addition to operating a retail store at the above-captioned address, Melton also sells big game fishing supplies and related goods on its website and over the phone, and is a certified dealer of Accurate fishing reels.

13.    In December 2016, Umansky planned to buy six (6) Accurate ATD-30 fishing reels and six (6) Accurate ATD-50W fishing reels as a Christmas present. Umansky looked into purchasing these reels from several dealers, including Melton.

14.    On or about December 20, 2016, George and Ellen called Melton on the phone (hereinafter the "initial phone call"). In the initial phone call, with Ellen present, George spoke with Andrew Alvarez, a sales representative working for Melton (hereinafter "Alvarez").

15.     During the initial phone call, George made it clear to Alvarez that the reels were being ordered as a Christmas present, and that the reels might have to be returned if it turned out they had already been purchased somewhere else. George stressed that it was important that Umansky could return the reels. George also specifically requested that no line be put onto the reels, in order to be able to return them in new condition.

16.     Having had experience as a reel retailer, George was careful to make sure that the reels Umansky ordered were standard and not a special order, so that they could be returned if Umansky needed to return them.

17.     During the initial phone call, Alvarez told George that returning the reels if Umansky did not need them would not be a problem. Alvarez told George that Melton had six (6) Accurate ATD-30 reels in stock, but only four (4) ATD-50W reels. Alvarez stated that the remaining two reels would have to be ordered, and would be shipped later in a separate order.

18.     On or about December 21, 2016, Umansky called Melton back to order the ten fishing reels they had in stock, for a total of $12,236.46 (including $196.56 in shipping fees) (copy of invoice attached hereto as **Exhibit A**). This order consisted of the six (6) Accurate ATD-30 fishing reels and four (4) Accurate ATD-50W fishing reels (collectively, the "12-21 purchase").

19.     Umansky provided her credit card information and authorized Melton to charge her Discover credit card for this purchase.

20.     In addition to the ten reels in the 12-21 purchase, Umansky also ordered two (2) additional Accurate ATD-50W reels (the "back-ordered reels"). Because Melton did not currently have enough ATD-50W reels in stock, Alvarez confirmed that the back-ordered reels would be shipped later and charged as a separate purchase. Alvarez never indicated that the

back-ordered reels would constitute a special order, or that they would be subject to a restocking fee.

21.     At no point during the initial phone call did Alvarez indicate that any of the reels would not be able to be returned for a full refund. Alvarez made no mention of any restocking fee, or that only store credit would be available if the reels were returned. Alvarez did not tell Umansky that this would be a special order or a rush delivery. Additionally, Alvarez failed to present Umansky with any documents regarding its merchant policies.

22.     Nowhere on the invoice for the 12-21 purchase is there any mention that the reels were a special order, or a rush delivery, or subject to a 20% restocking fee, or returnable for store credit only. **Exhibit A**.

23.     The reels ordered in the 12-21 purchase and the back-ordered reels were regularly stocked items, not special order.

24.     A representative of Accurate (the manufacturer of the reels) later confirmed to Umansky via email that the Accurate ATD-30 and ATD-50W reels in silver "should never be considered a special order product or color" by any approved Accurate dealer (copy of email attached hereto as **Exhibit B**).

25.     Silver was the standard color for the Accurate ATD-30 and ATD-50W reels offered on Melton's website, with no mention of the reels being a special order, or only returnable for store credit, or subject to a 20% restocking fee if returned. *See* screenshot of reels listed for sale on Melton's website, attached hereto as **Exhibit C**.

26.     When six Accurate ATD-30 and six Accurate ATD-50W reels are placed in a customer's "shopping cart" on Melton's website, one of the standard options available for shipping is "Priority Overnight (1 Business Day, Not Available for Saturday Delivery)," which is $59.99 for

the twelve reels. (Screenshot of "shopping cart" with the twelve reels in it attached hereto as **Exhibit D**.) To place the order, a customer is required to check a box that says "I have read and agree with Melton Tackle's Shipping and Handling Policies." **Exhibit D**.

27.     The "Priority Overnight" shipping is the fastest and most expensive shipping offered on Melton's website for this order. **Exhibit D**.

28.     There is no option to select shipping that costs anywhere near $196.56, which is what Umansky was charged in shipping fees for the 12-21 order. **Exhibit D**.

29.     Melton's Shipping and Handling Policies (attached hereto as **Exhibit E**) include:

"10. Returns/Exchanges: If for any reason you are not 100% satisfied with your purchase, please contact our customer service dept. within 21 days of receipt for a Return Authorization. Returns/Exchanges without authorization WILL NOT BE ACCEPTED. Returns/Exchanges after 21 days of original receipt WILL NOT BE ACCEPTED. All Returns/Exchanges MUST be in original packaging and in unused/re-sellable condition."

30.     Also included in these Shipping and Handling Policies is Melton's stated policy on backorders: "If we are out of stock on an item, you may choose for us to backorder these items and ship later. Please specify at checkout if you would like out of stock items backordered. Unfortunately, we are unable to backorder items totaling less than $15. Additionally, backorders are not accepted outside the Continental United States." **Exhibit E**.

31.     Umansky received the ten reels from the 12-21 purchase in the mail on December 24, 2016.

32.     Umansky made the 12-21 purchase in good faith, intending the reels to be used as a Christmas gift.

33.     Reels had already been purchased for the intended recipient of the Christmas present, and therefore the reels Umansky ordered from Melton were not needed.

34.     On December 27, 2016, Umansky called Melton to inform them that she needed to return the reels from the 12-21 purchase. Umansky spoke with Agnes, a Melton Tackle Customer Service representative. Agnes told Umansky that the back-ordered reels were scheduled to be shipped out that day. Umansky asked Agnes to cancel the order for the back-ordered reels. Upon information and belief, Agnes canceled the order for the back-ordered reels right then, while Umansky waited on hold.

35.     On December 27, 2017, a second invoice was generated, quoting the price for the back-ordered reels as $2,629.97 (including $59.99 for shipping by FedEx) (the "12-27 invoice") (copy of the 12-27 invoice attached hereto as **Exhibit F**).

36.     On December 27, 2016, Agnes sent Umansky an email providing her with a Return Authorization for the 12-21 purchase (the "RA"). (Copy of email attached as **Exhibit G**.) This email instructed Umansky to write the RA number on the outside of the package, and to include a note specifying whether she needed a return, exchange, store credit, or refund for the purchase. **Exhibit G**. The email advised Umansky to "allow 2-4 weeks for the RETURN/EXCHANGE/STORE CREDIT/REFUND to go through." *Id.* Nowhere in this email is there any mention that the return would be subject to a 20% restocking fee, or that the return would only be eligible for store credit rather than a refund.

37.     While on the phone with Agnes on December 27, 2017, Umansky cancelled the order for the back-ordered reels described in the 12-27 invoice before it shipped. (Screenshot of FedEx Tracking for the order attached as **Exhibit H**.) Umansky never authorized Melton to charge her

credit card for the back-ordered reels. Melton never shipped the back-ordered reels to Umansky.
**Exhibit H**. The back-ordered reels were never delivered to Umansky.

38.     Despite cancelling the order for the back-ordered reels before they shipped, and never
receiving the reels, Umansky nevertheless received a charge on her credit card from Melton for
the back-ordered reels, including shipping costs.

39.     On or about December 28, 2017, Umansky returned the reels from the 12-21 purchase,
mailing them back to Melton via USPS priority mail. The reels were returned within 21 days of
receipt in unused condition and in the original packaging, and therefore in compliance with
Melton's policy for Returns/Exchanges.

40.     On January 5, 2017, Umansky received an email from Alvarez confirming that the
returned reels from the 12-21 purchase had been received.

41.     Between January 5 and 10, 2017, Umansky followed up with phone calls to Melton
because no refund had been issued for the 12-21 purchase.

42.     On January 10, 2017, Umansky emailed Alvarez to find out why Melton had not
refunded her money yet.

43.     On January 11, 2017, Alvarez sent Umansky an email saying that because the reels were
"special ordered and rushed," they were subject to a 20% restocking fee, and that Umansky
could only receive store credit for the difference rather than a refund of the purchase price (copy
of email attached hereto as **Exhibit I**). Alvarez further stated that Melton "had to return those
reels to Accurate," that Accurate was charging Melton a 20% restocking fee, and that Melton
only received account credit instead of cash from Accurate when they returned the reels. **Exhibit
I**.

44.     The email from Alvarez on January 11, 2017 was the first time Melton made any

indication to Umansky that a full refund would not be available if she needed to return her

purchase. Throughout the process of ordering the reels online and returning them, there had been

no mention of any policy that would make the product not eligible for a full refund, provided that

the product was returned within the time frame and in the condition specified in the Shipping and

Handling Policies.

45.     On March 16, 2017, Umansky spoke on the phone with Justin, a sales manager working

for Accurate (the manufacturer of the reels at issue). During this phone call, Justin verified that

Melton had five or six of the reels in question in stock. Justin also confirmed that these reels

would not have been a special order, and that Melton did not return them to Accurate or pay

Accurate a 20% restocking fee.

46.     Tackle Direct is another certified dealer of Accurate reels. Kraig Friedman, who works in

sales for Tackle Direct, confirmed to Umansky that silver is the standard color for the Accurate

ATD-30 and ATD-50W reels, and that the reels would not require a special order from Accurate.

Friedman also confirmed that under Tackle Direct's return policy, the reels could be returned for

a full refund if unused and within the original packaging within thirty days of receipt, with no

restocking fees (copy of Friedman's email to Umansky attached hereto as **Exhibit J**).

47.     Plaintiff purchased the aforesaid goods on her Discover card, issued and provided by

Discover.

48.     On or about January 12, 2017, Umansky made a complaint to Discover disputing the

$2,692.97 charge for the back-ordered reels, *which were never shipped* ("First Billing Error"),

and disputing the $12,236.46 charge for the 12-21 order, which she returned to Melton in

accordance with Melton's stated return policy ("Second Billing Error") (collectively, the "Billing Errors").

49.     Specifically, on January 12, 2017, Umansky provided Discover with written notice via the Discover website's portal for such notices of the billing errors within sixty days of the statement reflecting the billing errors. Plaintiff does not possess a copy of the written notice; however, upon information and belief, Discover possesses a copy of the written notice that it received. However, Plaintiff provided the same information via the website portal that Plaintiff provided Discover via regular mail on March 24, 2017. *See* **Exhibit K**.

50.     In accessing the billing error dispute portal via an internet link on Plaintiff's Recent Activity webpage, Plaintiff accessed the Frequently Asked Questions concerning Billing Errors to confirm she was taking the appropriate steps to protect herself under all applicable laws. *See* **Exhibit L**.

51.     Discover's Frequently Asked Questions stated in part:

> **How do I file a Billing Error Notice?**
>
> To protect your rights regarding a Billing Error, you must contact us (or visit https://discover.com/billingerrornotice) within 60 days after the Billing Error first appeared on a billing statement. Please include your name, account number, the date, amount, and type of Billing Error, and the reasons why you think a Billing Error exists. You may include any supporting documentation, although you are not required to do so. You can notify us of a Billing Error online here or be sending a written notice of Billing Error to:
>
> Discover
> PO Box 30421
> Salt Lake City, IT 84130-0421
>
> You may also contact us on the Web: https://discover.com/billingerrornotice
> Also, if you have not receieved a billing statement from us, please write us at the same address or visit the website above.
>
> **You can call us, but if you do, we are not required to investigate any potential Billing Errors, and you may have to pay the amount in question.**

The Billing Rights Notice included in your Cardmember Agreement, also available at discover.com/billingrights, explains your rights. For information about other disputes, click here.

*See* **Exhibit L** (emphasis added in last paragraph).

52.     Further, the Billing Rights Notice states that if Plaintiff has a billing error, Plaintiff "may also contact us on the Web… You must notify us of any potential errors in writing or electronically. You may call us, but if you do we are not necessarily required to investigate any potential errors and you may have to pay the amount in question." *See* **EXHIBIT M**.

53.     Nowhere in the Frequently Asked Questions or the Billing Rights Notice does Discover give any warning or direction to customers that their rights may be impaired if the customer submits the billing dispute via the web portal Discover created and maintained for such purposes. *See* **Exhibits L & M**.

54.     Plaintiff, depending on Discover's above representations, did not call Discover but instead used the online portal to provide written documentation concerning the Billing Errors to Discover as it advised, including Plaintiff's "name, account number, the date, amount, and type of Billing Error, and the reasons why you think a Billing Error exists." *See* CIVIL ACTION NO.: 2:17-cv-04712.

55.     Further, upon information and belief, Discover's web portal provides the written documentation received in the web portal to the appropriate Department designated in the Cardmember Agreement, i.e. PO Box 30421, Salt Lake City, IT 84130-0421.

56.     On January 18, 2017, Melton sent Discover a letter in response to Umansky's billing disputes (copy of letter attached hereto as **Exhibit O**). This letter does not state that the back-ordered reels were ever shipped to Umansky.

57.     In early February 2017, Discover sent Umansky an email concerning the Billing Errors, stating that the charges were "valid based on merchant's documentation."

58.     Within ten days of Discover's response concerning the Billing Errors, Umansky wrote to Discover, advising Discover that Umansky stilled believed that the charges were wrong. Specifically, Plaintiff write to Discover via its online Billing Error portal. Plaintiff does not possess a copy of the written notice; however, upon information and belief, Discover possesses a copy of the written notice that it received.

59.      The Billing Rights Notice states in part:

> If you receive our explanation but still believe your bill is wrong you must write to us **(or visit https://discover.com/billingerrornotice)** within 10 days telling is that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your bill. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us.

*See* Exhibit M (emphasis added).

60.     On March 12, 2017, Discover sent Umansky an email responding to Umanky's written notice, stating that the charge was found to be "valid based on merchant's documentation."

61.     Realizing that Discover was not acting in good faith, Umansky called Discover multiple times to determine how to appropriately move the dispute to the next stage.

62.     Plaintiff spoke to Evan Gentry, who asked Umansky to submit the information yet again via fax or mail.

63.     Accordingly, on March 24, 2017, Umansky mailed Discover the packet of documentation showing why the charges were invalid.  *See* **Exhibit K**. Despite follow-up phone calls, Plaintiff never received a response from Discover.

64.     Discover reported the delinquency in Umansky's credit card account to third-party credit reporting agency, without also notifying the third party that the charges were still in dispute, and without providing Umansky in writing with the name of the third party to whom Discover reported the delinquency.

65.     Prior to May 2017, Umansky's credit score was consistently in the "very dependable" range, staying between 748 and 774 in the previous ten months. (Copy of Umansky's FICO credit score history attached hereto as **Exhibit P**.)

66.     Between May 2017 and July 2017, Umansky's credit score dropped 138 points from 767 to 629, placing her credit score in the "below average" range. *See* **Exhibit P**. The key factor in this change was a "serious delinquency from late or missed payments." *Id.* This sole serious delinquency was the result of the Billing Errors.  In fact, Umansky's credit score is now approximately 520, due solely to the Billing Errors, which is in the "very poor" range.

67.     Due to this significant drop in Umansky's credit score, she has been unable to obtain financing for purchases.

68.     Umansky has also had had credit limit lowered on a different credit card, and has had another credit card account closed, because of the "serious delinquency" reported by Discover to the third-party credit reporting agency without a corresponding notice that the debt was disputed.

**IV.    COUNTS OF ACTION**

<u>**COUNT I**</u>
**Breach of Contract / Breach of Implied Good Faith & Fair Dealing**
*Plaintiff v. Melton*

69.     Plaintiff incorporates the previous paragraphs as if set forth at length herein.

70.     At all times relevant hereto, Plaintiff and Defendant Melton were parties to a contract(s) for the sale of goods, express and/or implied at law, which included implied duty of good faith and fair dealing.

71.     The contract(s) concerned the sale of the six (6) Accurate ATD-30 fishing reels and six (6) Accurate ATD-50W fishing reels.

72.     The contract(s) were subject to the terms Melton communicated to Umansky during the initial phone call, as well as the terms and conditions of Melton's written Shipping and Handling Policies and Returns/Exchanges Policies, located on Melton's website.

73.     Melton breached the terms of the contract(s), specifically the Returns/Exchanges Policies by refusing to provide a full refund to Plaintiff's credit card for the fishing reels.

74.     Further, Melton breached violated the implied duty of good faith and fair dealing in the contract by initialing representing that Plaintiff would be able to return the products for a full refund, but later refusing to do so.

75.     As a result of Melton's breaches, Plaintiff has been financially harmed.

### COUNT II
### Unjust Enrichment
### *Plaintiff v. Melton*

76.     Plaintiff incorporates the previous paragraphs as if set forth at length herein.

77.     Upon representations by Melton that Plaintiff could return reels for a full refund, Plaintiff purchased six (6) Accurate ATD-30 fishing reels and six (6) Accurate ATD-50W fishing reels from Melton.

78.     However, after returning the six (6) Accurate ATD-30 and four (4) Accurate ATD-50W fishing reels and cancelling the back-order of two (2) Accurate ATD-50W fishing reels, Melton refused to provide Plaintiff a full refund.

79.     Instead, Melton kept a restocking fee of approximately $2,922 on the returned/cancelled goods.

80.     In addition, Melton refused to return the remainder of the purchase funds of approximately $11,944, instead offering only store credit.

81.     Plaintiff received no benefit for the approximately $14,866 that she paid Melton.

82.     Melton received an unjust enrichment of approximately $14,866 from Plaintiff and it would be unconscionable for Defendant to retain that benefit.

## COUNT III
### Fraud / Fraudulent Misrepresentation
*Plaintiff v. Melton*

83.     Plaintiff incorporates the previous paragraphs as if set forth at length herein.

84.     Melton's fraudulent and material misrepresentations included, but were not limited to, knowing or having reason to know that Melton would charge a 20% restocking fee for returned items and would only provide store credit as a refund.

85.     Melton intentionally misled Plaintiff by telling Plaintiff that if she should have any reason to return the products within 30 days, Plaintiff would receive a full refund to her credit card.

86.     Melton intentionally mislead Plaintiff concerning its return practices while Plaintiff was considering purchasing the goods in order to induce Plaintiff to purchase the goods.

87.     Umansky would not have purchased the reels from Melton if she had not been assured that she would be able to return the good for a full refund in the event that the reels were not needed as a Christmas present.

88.     At all times material, Plaintiff justifiably and detrimentally relied upon the material intentional and/or fraudulent misrepresentations of Melton, which resulted in the above damages.

89.     By representing to Umansky over the telephone that she would be able to return the reels she was thinking of purchasing, Melton committed fraud in the inducement of the contract for the sale of goods.

### COUNT IV
**Violations of Pennsylvania Unfair Trade Practices & Consumer Protection Law**
*Plaintiff v. Melton*

90.     Plaintiff incorporates the previous paragraphs as if set forth at length herein.

91.     At all times material, Melton is a "person(s)" engaged in trade or commerce as that term is defined by the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1, et seq. (hereinafter "UTPCPL").

92.     At all times material, the goods were purchased by Plaintiff to be used for personal, family and/or household use.

93.     The conduct of Melton by and through their agents, servants, workmen and employees, constituted "unfair or deceptive practices" within the meaning of the UTPCPL including engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding; 73 P.S. §201-2(4)(xxi);

94.     By orally representing to Plaintiff that the reels could be returned for a full refund, Melton intentionally and/or recklessly created a misunderstanding on the part of Plaintiff with regard to purchase of the fishing reels.

95.     By failing to inform Plaintiff over the phone or via its Return / Exchange policy stated on its website Melton's practice of charging restocking fees and only providing store credit for returns, Melton engaged in deceptive or fraudulent conduct that created a misunderstanding on the part of Plaintiff.

96.     By failing to inform Plaintiff that the reels were a "special order" when the order was placed, while the industry practice and circumstances dictated the order was not a "special order", and then charging a 20% restocking fee and only provide store credit as a refund, Melton engaged in deceptive or fraudulent conduct that created a misunderstanding on the part of Plaintiff.

97.     By charging Umansky $196.56 for shipping her order while the same "Priority Shipping" would have cost only $59.99 if she had ordered through the website without informing Plaintiff of the differential, Melton engaged in deceptive sales practices.

98.     But for Melton's fraudulent and deceptive conduct, Plaintiff would not have purchased the fishing reels.

99.     Pursuant to the UTPCPL, Plaintiff is entitled to treble damages, and reasonable attorney's fees and costs.

**COUNT V**
**Violation of Fair Credit Billing Act**
*Plaintiff v. Discover*

100.    Plaintiff incorporates the previous paragraphs as if set forth at length herein.

101.    At all times material, Discover is a "creditor(s)" as that term is defined by the Federal Fair Credit Billing Act, 15 U.S.C. § 1666, et seq. (hereinafter "FCBA").

102.    Under the FCBA, a billing error includes "A reflection on a statement of goods or services not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the agreement made at the time of a transaction." 15 U.S.C. § 1666(b)(3).

103.    When evaluating billing disputes for billing errors where the goods were not delivered to the obligor in accordance with the agreement made at the time of the transaction, the FCBA

mandates that "a creditor may not construe such amount to be correctly shown unless he determines that such goods were actually delivered, mailed, or otherwise sent to the obligor and provides the obligor with a statement of such determination."

104.    Plaintiff provided Discover with written notice via the Discover website's portal for such notices of the billing errors within sixty days of the statement reflecting the billing errors in accordance with Discover's aforementioned representations on its website.

105.    Per Discover's aforementioned representations, written submissions of a Billing Dispute online triggers Discover's responsibilities to investigate. To the extent that Discover provides a website portal for the filing of customer billing disputes that does not satisfy the FCBA, Discover's aforementioned practice concerning online billing disputes is a deceptive and/or unfair business practice under the Pennsylvania Unfair Trade Practices & Consumer Protection Law; i.e. Discover engages in a deceptive practice of misleading customers, including Plaintiff, that they are appropriately and legally reviewing customer's complaint within the confines of the law.

106.    The First Billing Error is a billing error under the FCBA because the order was never delivered to Umansky.

107.    Discover notified Umansky that it had determined that the charges were "valid based on merchant's documentation." However, Discover did not confirm that the good was actually delivered (as they were not); not did Discover provide Plaintiff any statement of such a determination.

108.    As such, Discover violated the FCBA by violating 15 U.S.C. § 1666(a)(3)(B)(ii), which states in part:

> In the case of a billing error where the obligor alleges that the creditor's billing statement reflects goods not delivered to the obligor or his designee in accordance

> with the agreement made at the time of the transaction, a creditor may not construe such amount to be correctly shown unless he determines that such goods were actually delivered, mailed, or otherwise sent to the obligor and provides the obligor with a statement of such determination.

15 U.S.C. § 1666(a)(3)(B)(ii).

109.    Further, the Second Billing Error is a billing error under the FCBA because Umansky returned the goods under the terms agreed to at the time of the original transaction.

110.    Discover reported the unpaid debt to several credit reporting agencies without notice that the debt was in dispute *and* failed to inform Plaintiff of the name and address of each party Discover so informed.

111.    As such, Discover further violated the FCBA by violating 15 U.S.C. § 1666a(b), which states in part:

> If a creditor receives a further written notice from an obligor that an amount is still in dispute within the time allowed for payment under subsection (a) of this section, a creditor may not report to any third party that the amount of the obligor is delinquent because the obligor has failed to pay an amount which he has indicated under section 1666(a)(2) of this title, **unless the creditor also reports that the amount is in dispute and, at the same time, notifies the obligor of the name and address of each party to whom the creditor is reporting information concerning the delinquency.**

*See* 15 U.S.C. § 1666a(b) (emphasis added).

112.    As a result of Discover's violations, Plaintiff has been financially harmed.

<u>**COUNT VII**</u>
**Violations of Pennsylvania Unfair Trade Practices & Consumer Protection Law**
*Plaintiff v. Discover*

113.    Plaintiff incorporates the previous paragraphs as if set forth at length herein.

114.    At all times material, Discover is a "person(s)" engaged in trade or commerce as that term is defined by the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1, et seq. (hereinafter "UTPCPL").

115.    At all times material, the goods were purchased by Plaintiff to be used for personal, family and/or household use.

116.    The conduct of Discover by and through their agents, servants, workmen and employees, constituted "unfair or deceptive practices" within the meaning of the UTPCPL including engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding; 73 P.S. §201-2(4)(xxi).

117.    Specifically, by violating the terms of the Fair Credit Billing Act, Discover engaged in fraudulent or deceptive conduct that created a likelihood of confusion or of misunderstanding.

118.    Further, to the extent that Discover provides a website portal for the filing of customer billing disputes that does not satisfy the FCBA (as their attorneys have argued), yet only warns customers that submission of their Billing Dispute may not be investigated if it is submitted via a call, Discover has engaged in a deceptive, misleading, and/or unfair trade practice, upon which Plaintiff relied.

119.    Pursuant to the UTPCPL, Plaintiff is entitled to treble damages, and reasonable attorney's fees and costs.

## COUNT VIII
### Fraud
*Plaintiff v. Discover*

120.    Plaintiff incorporates the previous paragraphs as if set forth at length herein.

121.    Discover represented to Plaintiff that it would investigate any billing error that Plaintiff submitted via its online portal.

122.    Plaintiff, justifiably depending on Discover's representation, submitted two Billing Errors to Discover.

123.    However, despite Discover's representation to Plaintiff, Discover did not investigate the Billing Errors in good faith.

124.    As a result of Discover failing to investigate the billing error in good faith, Discover continued to report the Billing Errors as unpaid debt to Plaintiff's detriment.

125.    Discover further represented to Plaintiff that, if Plaintiff notified Discover that the Billing Errors remained in dispute within fifteen days of its notice, Discover would report Plaintiff as delinquent along with a notice that the debt was in dispute.

126.    Plaintiff, justifiably depending on Discover's representation, notified Discover that the Billing Errors remained in dispute within fifteen days of its notice.

127.    However, despite Discover's representation to Plaintiff, Discover reported Plaintiff as delinquent but did not include a notice that the debt was in dispute.

128.    As a result of Discover's fraudulent actions, Plaintiff has been financially harmed.

### V.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that judgment be entered against Defendants, individually, jointly and/or severally, in excess of seventy-five thousand dollars, including compensatory, statutory, treble, and punitive damages, together with interests, costs, and attorneys' fees, plus any further equitable relief that this Honorable Court deems just and appropriate.

Respectfully submitted,

**WEISBERG LAW**                                **SCHAFKOPF LAW, LLC**

*/s/ Matthew B. Weisberg*                      */s/ Gary Schafkopf*
Matthew B. Weisberg                            Gary Schafkopf
Attorney Id. No.: 85570                        Attorney ID No. 83362
L. Anthony DiJiacomo, III                      11 Bala Ave
Attorney Id. No.: 321356                       Bala Cynwyd, PA 19004
7 South Morton Ave.                            610-664-5200 Ext 104
Morton, PA 19070                               Fax: 888-283-1334

610-690-0801
Fax: 610-690-0880                    *Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ELLEN UMANSKY | : | |
| | : | |
| v. | : | CIVIL ACTION NO.: 2:17-cv-04712 |
| | : | |
| MELTON INTERNATIONAL | : | |
| TACKLE, et al. | : | |

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew B. Weisberg, Esquire, hereby certify that on this 14th day of December, 2017,

a true and correct copy of the foregoing Plaintiff's First Amended Civil Action Complaint was

served via ECF via Notice Filing and regular mail upon the following parties:

Daniel J.T. McKenna, Esq.
Jenny Perkins, Esq.
Marissa Edwards, Esq.
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street
51st Floor
Philadelphia, PA 19103-7599

Melton International Tackle
1375 S. State College Blvd.
Anaheim, CA 92806

**WEISBERG LAW**

/s/ Matthew B. Weisberg
Matthew B. Weisberg, Esquire
*Attorney for Plaintiff*